**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BRENDAN BEARDSLEY *et al.*,

               Plaintiffs,

        -v-                              1:23-CV-1641 (AJB/ML)

COUNTY OF SARATOGA,

               Defendant.
_____

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

## I.    INTRODUCTION

On December 27, 2023, plaintiffs—a group of more than one hundred current and former employees of the Saratoga County Sheriff's Office—filed this civil action alleging that defendant County of Saratoga ("defendant") violated the Fair Labor Standards Act ("FLSA") by, *inter alia*, failing to pay them for pre-shift work that should result in overtime. Dkt. No. 1. The matter was initially assigned to Senior U.S. District Judge Thomas J. McAvoy. *See id*.

Defendant answered, Dkt. No. 16, and the parties attempted mediation, Dkt. No. 26. But when mediation failed, Dkt. No. 34, the parties agreed to conduct representative discovery using ten mutually agreed-upon plaintiffs working in five distinct job titles at the Sheriff's Office, Dkt. Nos. 42-2, 45-1. The case has since been reassigned to this Court. Dkt. No. 47.

On January 17, 2025, plaintiffs moved for summary judgment on the issue of defendant's liability under the FLSA. Dkt. No. 42. Although plaintiffs acknowledge that a fact-finder might be required for damages (assuming they are unable to work out the numbers after liability issues are decided), they assert that the undisputed facts establish that defendant has failed to pay them

for periods of pre-shift work that should result in overtime pay, and when defendant does pay them for other periods of overtime, it often fails to do so promptly and accurately. *Id.*

The motion has been fully briefed, Dkt. Nos. 45, 46, and will be considered on the basis of the submissions without oral argument.

## II.     BACKGROUND

The facts are taken primarily from plaintiffs' Statement of Material Facts ("SOF"), Dkt. No. 42-2, and are undisputed unless otherwise noted. For reasons explained in more detail *infra*, the Court has also deemed admitted certain facts that were "disputed" in defendant's Response to Plaintiff's Statement of Material Facts ("D's Resp."), Dkt. No. 45-1.

Plaintiffs are employed by defendant in the Sheriff's Office. SOF ¶ 1. They hold one of five different jobs: (1) Corrections Officer; (2) Corrections Sergeant; (3) Desk Officer; (4) Desk Sergeant; and (5) Civil Clerk. *Id.* Corrections Officers and Sergeants ("CO plaintiffs") work at the Correctional Facility. *Id.* ¶ 2. Desk Officers and Sergeants ("Dispatch plaintiffs") work in the Communications Center of the Public Safety Building, which is located right next door to the Correctional Facility. *Id.* ¶ 4. Civil Clerks also work at the Public Safety Building, but in one of two different offices within the safety building's Administrative Services Department. *Id.* ¶ 7.

CO plaintiffs work a regular schedule of 40 hours a week that is broken up into 5 days of 8-hour shifts. SOF ¶ 30. Dispatch plaintiffs work the same 40-hour-a-week schedule. *Id.* ¶ 74. However, Civil Clerks are only scheduled to work 37.5 hours a week: they still work 5 days of 8-hour shifts, but defendant deducts a 30-minute meal period from each working day. *Id.* ¶ 115.

Defendant has an electronic timekeeping system called "Kronos" installed in some of its departments.[1] SOF ¶ 25. But employees of the Sheriff's Office still use a "manual punch clock"

---

[1] Kronos-compatible timeclocks have been installed in Sheriff's Office facilities, but employees are not required to use them and there is currently no timeline for the Sheriff's Office to switch over to Kronos. SOF ¶¶ 26–28.

system for recording their time. *Id.* ¶ 9. Every two weeks, Sheriff's Office employees receive a "physical timecard" to use in one of the manual punch clocks located in the Correctional Facility or the Public Safety Building. *Id.* ¶¶ 10, 13. For example, the CO plaintiffs use the punch clock that is located in the Correctional Facility's briefing room, *id.* ¶ 37, while the Dispatch plaintiffs use the punch clock that is located near the back door of the Public Safety Building, *id.* ¶ 80.

Employees keep their timecards near these manual punch clocks. SOF ¶ 13. Employees are required to insert their timecard in the punch clock at the beginning and end of each of their scheduled shifts. *Id.* ¶¶ 11–12. Employees are expected to handwrite certain notations on these timecards, including information about shift swaps, vacation days, compensatory time, and pre-approved overtime. *Id.* ¶ 14; Bessette Dep., Dkt. No. 42-21 at 17[2] (explaining overtime must be approved by a supervisor and will usually be noted by that supervisor on the timecard).

These timecards are collected every two weeks by Sheriff's Office employees Heather Bessette and Julie Grant. SOF ¶ 18. Bessette and Grant are responsible for adding up the total number of regular hours and overtime hours on each timecard. *Id.* ¶ 19. These administrative employees also record how many hours each employee might want to "bank" as compensatory time. *Id.* Afterward, Bessette and Grant enter this data into defendant's payroll software, which is called Tyler Technologies "New World." *Id.* ¶¶ 22–23. Defendant uses this payroll software to calculate the payment owed to each employee and then generates paychecks. *Id.* ¶ 24.

Defendant uses a "rounding system" to determine time that an employee works beyond the <u>end</u> of their regularly scheduled shift. SOF ¶ 15. This system "rounds" to the quarter hour. *Id.* Thus, if the employee's shift ended at 12:00 a.m. and they punched out at any time between 12:00 a.m. and 12:07 a.m., defendant would round that time *down* to 12:00 a.m. for the purpose

---

[2] All pagination corresponds with CM/ECF headers generated on individual documents.

of payroll.  *Id*.  On the other hand, if the same employee punched out between 12:08 a.m. and

12:22 a.m., defendant would round that time *up* to the next quarter hour for the purpose of

payroll, resulting in 15 minutes of overtime.  *Id*.

Defendant also uses this rounding system to calculate the <u>start</u> of shifts.  SOF ¶ 16.  But

defendant only rounds pre-shift working time in one direction—down.[3]  *Id*.  In defendant's view,

always rounding down against the start time of scheduled shifts is no problem because officially,

Sheriff's Office employees "are not permitted to clock in until seven minutes prior to the start of

their scheduled shift," *id*., and, officially, employees "are not permitted to perform work prior to

punching in with the time clock."  D's Resp. ¶ 17.

Under the FLSA, a "rounding" system is not necessarily problematic.  An employer can

compute working time this way "provided that it is used in such a manner that it will not result,

over a period of time, in failure to compensate the employees properly for all the time they have

actually worked."  29 C.F.R. § 785.48(b).

The central premise of this litigation is that defendant's rounding system, in combination

with its other policies and rules, fails to compensate employees properly.  To that end, the parties

agree that defendant has a Sheriff's Office policy prohibiting employees from "clocking in" until

7 minutes before the start of their scheduled shift.  SOF ¶ 16.  But the problem is that plaintiffs

regularly arrive to work before the start of their scheduled shift and perform compensable work

before clocking in no more than 7 minutes early (which is always rounded *down* for payroll).[4]

---

[3]  Defendant "admits" this fact in his response to plaintiff's SOF, D's Resp. ¶ 16, but later purports to contest its
veracity in his opposition memo, Def.'s Opp'n, Dkt. No. 45 at 3.  Based on this admission and other testimonial
evidence in the record, this fact will be deemed admitted for the purpose of summary judgment.

[4]  Defendant claims that an employee who clocked in more than 7 minutes early would still have their time rounded
up to the next quarter hour.  *See, e.g.*, D's Resp. ¶ 81.  Even so, Bessette testified that an employee who clocked in
more than 7 minutes early without permission from a supervisor would not be approved for payment.  Bessette Dep.,
Dkt. No. 45-17 at 40–41.  Defendant has failed to place this fact in dispute for the purpose of summary judgment.

For instance, CO plaintiffs regularly arrive to work between 15 and 40 minutes before the start of their shift.  SOF ¶ 38.  They use this time to obtain required equipment and gear up in the locker room.  *See id.* ¶¶ 38, 40, 42, 44, 47.  This pre-shift routine includes locating and donning items like a duty belt, radio, pepper spray, and a cutdown tool.[5]  SOF ¶ 44.  Defendant "denies" that CO plaintiffs engage in this pre-shift routine because all plaintiffs "are required to punch in using the time clock prior to performing any job functions," including these duties.  D.'s Resp. ¶¶ 38, 40, 44.

This "dispute" over pre-shift routines aside, though, the parties agree that CO plaintiffs work in posts staffed 24 hours a day in rotating 8-hour shifts: 12:00 a.m. to 8:00 a.m. ("A-Line"), 8:00 a.m. to 4:00 p.m. ("B-Line"), and 4:00 p.m. to 12:00 a.m. ("C-Line").  SOF ¶¶ 29, 31.  The parties agree there is no scheduled overlap between these shifts, *id.* ¶ 32, and agree that plaintiffs are not allowed to leave their post until they are relieved by another officer.  *Id.* ¶ 66.  This relief process requires the outgoing and oncoming officer to verbally exchange some information and conduct a "count," which takes on average 5 to 15 minutes.  *Id.* ¶¶ 58–60.

Thus, regardless of the precise order in which each of these tasks might be performed, and whether or not every CO plaintiff performs each task the same way every time, the record establishes that CO plaintiffs regularly arrive and begin performing some amount of work prior to the start of their shift (before clocking in no more than 7 minutes before that shift is scheduled to start).  SOF ¶¶ 61–63.  As before, defendant "denies" these facts because this behavior would violate the policies and rules requiring employees to punch in before performing any work.  D's Resp. ¶¶ 61–63.

---

[5]  The parties dispute several of plaintiffs' assertions, including the issue of whether it is routine for CO plaintiffs to change into their uniforms before each shift and, relatedly, whether employees are permitted to wear their uniforms to and from work.  *Compare* SOF ¶¶ 39, 41, 43, *with* Dkt. No. 45-1 ¶¶ 41, 43.

Regardless of the existence of these official policies or rules, CO plaintiffs have not been prevented from starting to work before their scheduled shift begins and have not been disciplined for doing so.  SOF ¶ 69.  Defendant "denies" these facts by citing testimony from a Rule 30(b)(6) witness who testified that, although he did not "have any firsthand knowledge of it," it would be "the expectation" that a supervisor who observed a CO plaintiff doing any pre-shift work before clocking in would take some action to "prohibit" that employee from continuing to do so, since it would violate defendant's official policies and/or rules.  D's Resp. ¶ 69 (citing Emery Dep., Dkt. No. 45-14 at 128–29).

The same basic story is true about the Dispatch plaintiffs: they regularly arrive between 7 and 30 minutes before their scheduled shift.  SOF ¶ 82.  They use this time to perform necessary work tasks, which includes things like logging into computers and programs.  *Id*. ¶¶ 96–99.  This process can take between 3 and 15 minutes.  *Id*. ¶ 98.  Dispatch plaintiffs perform some of these tasks before clocking in for their shift.  *Id*. ¶¶ 105–06.

Again, defendant claims that this pre-shift work by Dispatch plaintiffs would violate its policies.  D's Resp. ¶¶ 82, 96, 100.  Even so, Dispatch plaintiffs have not been prevented from doing so or disciplined for it.  SOF ¶¶ 110–11.  As before, defendant "denies" this assertion by relying on testimony that only establishes a hypothetical: defendant's Rule 30(b)(6) witness on this topic testified that a violation of defendant's policy "could be" grounds for discipline.  D's Resp. ¶ 111 (citing Gordon Dep., Dkt. No. 45-20 at 89).

Civil Clerks also get to work around 15 minutes before their shift begins and start their job duties.  SOF ¶ 118.  As with the other Sheriff's Office employees, defendant's policies and rules preclude Civil Clerks from performing any work before punching in for the day.  D's Resp. ¶ 119.  But just like the other employees, Civil Clerks regularly perform tasks for which they go

unpaid. SOF ¶ 119. And just like other employees, Civil Clerks have not been prevented from doing so. *Id.* ¶ 130. Even so, defendant "denies" this because a Rule 30(b)(6) witness testified that "we weren't aware of that work having been performed." Chamberlain Dep., Dkt. No. 45-22 at 44); *see also* D's Resp. ¶ 130.

## III.    LEGAL STANDARD

The entry of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In conducting this analysis, the district court must view the facts and draw all reasonable inferences in the light that is most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Even so, there is no genuine issue of material fact for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## IV.    DISCUSSION

Plaintiffs contend that they are entitled to summary judgment on the issue of defendant's liability[6] as to three FLSA claims: (1) the failure to pay for compensable work performed before plaintiffs' scheduled shifts; (2) the failure to properly calculate plaintiffs' regular rate of pay; and (3) the untimely payment of plaintiffs' pre-approved overtime. Pls.' Mem., Dkt. No. 42-1 at 3.

---

[6] FLSA plaintiffs often seek a liability determination at the summary judgment stage. *See, e.g.*, *Rojas v. Splendor Landscape Designs LTD.*, 268 F. Supp. 3d 405, 409 (E.D.N.Y. 2017); *Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 496 (S.D.N.Y. 2015); *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 345–46 (E.D.N.Y. 2015).

### 1. Failure to Pay for Plaintiffs' Compensable Pre-Shift Work

The FLSA "imposes minimum-wage and maximum-hour requirements on certain U.S. employers." *Perry v. City of N.Y.*, 78 F.4th 502, 512 (2d Cir. 2023). As relevant here, the Act mandates that employees get paid a higher, overtime rate for working more than 40 hours in a single workweek. 29 U.S.C. § 207(a)(1). The statute does not actually define "work" or what counts as a "workweek." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 225 (2014). Instead, the FLSA defines the term "employ[ment]." 29 U.S.C. § 203(g).

Under the FLSA, "employment" is "work" that is "suffer[ed] or permit[ted]." 29 U.S.C. § 203(g) (cleaned up). This definition is a broad one. *See, e.g.*, 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time."). As the Second Circuit has explained, "[i]f the employer suffers or permits the work—either by requiring it, knowing about it, or failing to exercise reasonable diligence to discover it—then it must compensate the employee, even if the employee failed to report the work and even if the employer did not know that the employee was working unpaid." *Perry*, 78 F.4th at 509.

Plaintiffs have moved for partial summary judgment as to defendant's liability for unpaid overtime under this employee-friendly body of remedial law. Plaintiffs contend that defendant's timekeeping policy is "designed to evade the FLSA's overtime requirements." Pls.' Mem. at 8. As plaintiffs explain, they are "regularly and routinely" permitted to begin working "before their scheduled shifts," where they perform "compensable tasks that are required by the nature of their jobs." *Id*. At the same time, however, plaintiffs are *not* permitted to "clock into the timekeeping system until seven minutes prior to the start of their scheduled shift." *Id*.

In other words, defendant "suffers or permits" plaintiffs' pre-shift work but enforces the 7-minute clock-in rule against them (which gets rounded down to zero for payroll). Pls.' Mem.

at 8.  Thus, defendant's timekeeping policy creates "daily off-the-clock, unpaid overtime work" in addition to plaintiffs' 40-hour-a-week schedules.  *Id*.  Accordingly, this unpaid work must be compensated at the appropriate overtime rate under the FLSA.  *See id*.

Defendant, for its part, contends that these "claims of unpaid overtime are disputed" and a reasonable jury could find in its favor because it has "presented admissible evidence, including [defendant's] policies, witness testimony, and emails . . . showing that [these] claims of unpaid overtime are disputed."  Def.'s Opp'n, Dkt. No. 45 at 3.  As defendant explains:

> Defendant has no knowledge of pre-shift work being performed and have no reason to have such knowledge.  [SOF ¶ 162].  It is the policy of the County that employees are to punch in prior to performing any job functions.  *Id*.  Supervisory employees of Saratoga County are expected to take action if an employee is suspected of performing pre or post-shift work, but supervisors are not aware of any pre or post-shift work being performed.  *Id*. ¶ 68-69.  Plaintiffs claim that Defendant maintains a policy that only rounds down when an employee begins their shift but such is not the case.  An employee who punches in to work prior to seven minutes before the start of their shift will be compensated with an additional .25 hours of paid time.  *Id*. ¶ 80.  Every Post Order for employees of the Sheriff's Department direct employees to punch in prior to completing any tasks.  *Id*. ¶ 80.

Def.'s Opp'n at 3.

In reply, plaintiffs contend that defendant's argument mistakenly conflates the distinction between, on the one hand, an official policy that bars pre-shift work, and on the other, the factual question of whether plaintiffs are nevertheless "suffered or permitted" to perform pre-shift work (despite the fact that it might be occurring in violation of official policies or rules).  Pls.' Reply, Dkt. No. 46 at 5.  According to plaintiffs:

> To the extent such policies might exist, they are not enforced by the County in any way – Plaintiffs perform pre-shift work, they are expected to perform such work, and they are not stopped from performing the work or disciplined for doing so.  SOF ¶¶ 67-69,

> 107-111, 130. Whether or not supervisors are expected to prevent
> pre-shift work is not relevant, because in practice they do not. *Id.*

Pls.' Reply at 6.

The parties' dispute turns out to have a relatively straightforward answer, as least as to the question of defendant's *liability* for unpaid overtime. "To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011).

Measured against this general legal standard, the undisputed and admitted material facts conclusively establish that all plaintiffs have performed some amount of "work" for which they have not been compensated, and that defendant had actual, or certainly constructive, knowledge of this work. "Ultimately, the dispute as to the precise amount of [ ] uncompensated work is one of fact for trial." *Kuebel*, 643 F.3d at 364.

First, plaintiffs have offered testimony that is sufficient to establish that each of the five groups of Sheriff's Office employees (CO plaintiffs, Dispatch plaintiffs, and Civil Clerks) have performed work prior to clocking in for their scheduled shift. SOF ¶¶ 38, 40, 42, 44, 47, 61–63, 82, 96–99, 102, 105–06, 118–19, 130.

This testimony is largely if not entirely unrebutted for the purpose of summary judgment because defendant failed to validly place these facts in dispute. In his responsive submission to plaintiffs' Statement of Material Facts, defendant purports to "deny" these paragraphs. In doing so, defendant has (1) cited to documents and testimony that establish the existence of a policy or policies requiring each category of employees to clock in before starting work, D's Resp. ¶¶ 38, 40, 44, 61–63, 82, 96, 105, 119, 130, (2) asserted in conclusory terms that there is "ample time" for plaintiffs to clock in before starting work, *id.* ¶¶ 61–63, and (3) asserted, again in conclusory

terms, that defendant is not aware of plaintiffs doing work before clocking in, *id*. ¶¶ 82, 96, 105, 119, 130.

But these "denials" do not place plaintiffs' testimonial offering in dispute.  As plaintiffs correctly point out, what is relevant for FLSA liability is whether all plaintiffs were "suffered or permitted" to perform unpaid, pre-shift work, not whether official policies and/or rules exist that might preclude this pre-shift work.  *See* Pls.' Reply at 5.

Keep in mind that this is summary judgment.  Rule 56 creates a screening-out procedure that tasks the court with "discerning whether there are any genuine issues of material fact to be tried."  *Gallo v. Prudential Res. Servs., Ltd. P'Ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  "While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters, *i.e.*, whether [a dispute] concerns facts that can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (cleaned up).

"A reasonably disputed, legally essential issue is both genuine and material and must be resolved at trial."  *Graham*, 89 F.3d at 79.  However, a genuine question of material fact does not exist merely because the non-movant disagrees with the evidence produced by the movant.  *See, e.g., Andrade v. Cultural Care, Inc.*, 706 F. Supp. 3d 348, 355 (E.D.N.Y. 2023).  Where, as here, the non-movant has failed to "specifically controvert" the movant's properly supported showing, the Court may deem those facts admitted on summary judgment.  N.D.N.Y. L.R. 56.1(b)

Of course, the existence of official policies and/or rules that preclude pre-shift work may be relevant to defendant's knowledge of that work.  However, the existence of policies and rules does not place in genuine dispute the material facts being offered by plaintiffs, *i.e.*, that plaintiffs

regularly and routinely perform some amount of unpaid, pre-shift work, whether off the clock or clocked in but rounded down to zero as a result of defendant's timekeeping policies.

Second, in response to plaintiffs' well-supported claims that the various kinds of pre-shift tasks being performed by each category of plaintiffs is compensable "work" within the meaning of the FLSA, Pls.' Mem. at 10–11 (CO plaintiffs); 12–13 (Dispatch plaintiffs); 14 (Civil Clerks), defendant merely attempts to dispute—in basically conclusory terms—whether or not plaintiffs "must change into their entire uniform at work." Def.'s Opp'n at 3.

Again, though, defendant's attempt to place in dispute these uniform-wearing policies or rules is beside the point. Under the "continuous workday" doctrine, employers must compensate employees for the full period of time between the first principal activity of a workday to the last principal activity of the workday, "even if performed before or after the regular shift." *Kuebel*, 643 F.3d at 349 (citing *IBP, Inc. v. Alvarez*, 546 U.S. 21, 37 (2005)).

The unrebutted evidence establishes that plaintiffs perform pre-shift activities in various orders. *See, e.g.*, SOF ¶ 61, 104. As noted, plaintiffs have also established that these pre-shift tasks are compensable "work" under the FLSA. *See* Pls.' Mem. at 10–14. And whether or not plaintiffs are permitted to wear uniforms to and from work, there is unrebutted evidence that some plaintiffs do in fact change into their uniform after they arrive to work. *Id*. ¶¶ 42, 84, 119.

Thus, at least for the non-zero set of plaintiffs who change into their uniform (or perform any other task that might not ordinarily be compensable work) after performing the first principal activity of their workday, the "continuous workday" rule makes this time compensable under the FLSA. *See, e.g.*, *Perry*, 78 F.4th at 525.

As before, defendant attempts to place these and related facts in dispute by asserting that this behavior would violate official policy. D's Resp. ¶¶ 61–63, 82, 96, 100, 119. But as before,

plaintiffs' evidence establishes that they have not been prevented from starting to perform work before their shift begins and have not been disciplined for doing so.  SOF ¶¶ 69, 110–11, 130.

These unrebutted facts matter because the law is clear: an employer is obligated to take action to stop work that it does not want to pay for.  "An employer who has knowledge that an employee is working, and who does not desire the work to be done, has a duty to make every effort to prevent its performance."  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2d Cir. 2008).  Indeed, the Department of Labor has explained:

> it is the duty of management to exercise its control and see that work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them.  The mere promulgation of a rule against such work is not enough.  Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13.  In other words, an employer must "pay for all work they know about, even if they did not ask for the work, even if they did not want the work done, and even if they had a rule against doing the work."  *Allen v. City of Chicago*, 865 F.3d 936, 938 (7th Cir. 2017).

In addition to repeatedly citing to the existence of its official policies and rules, defendant has attempted to place in dispute plaintiffs' showing that they have been "suffered or permitted" to do pre-shift work (without being stopped or disciplined), by citing to supervisors or managers who claim that conduct would result in discipline.  But defendant's citations do not place these material facts in genuine dispute because the testimony on which defendant relies is grounded in hypothetical or speculative scenarios.

For instance, one of defendant's Rule 30(b)(6) witnesses[7] testified that it would be "the expectation" that a supervisor who observed a CO plaintiff doing pre-shift work before clocking

---

[7] Under Rule 30(b)(6), an organization must produce a witness who is knowledgeable about the subject matter of the proposed deposition.  FED. R. CIV. P. 30(b)(6).  The deponent's responses are binding on the organization.  *See, e.g.*, *Reilly v. Natwest Mkts. Grp., Inc.*, 181 F.3d 253, 268 (2d Cir. 1999).

in would "prohibit" that employee from continuing to do so, since it would violate defendant's policies.  D's Resp. ¶ 69 (citing Emery Dep., Dkt. No. 45-14 at 128–29).  Likewise, another of defendant's Rule 30(b)(6) witnesses opined that a policy or rule violation "could be" grounds for discipline.  D's Resp. ¶ 111 (citing Gordon Dep., Dkt. No. 45-20 at 89).

These witnesses' speculation about how defendant's policies and/or rules are supposed to work is hardly enough to place in genuine dispute the material fact that none of the plaintiffs has been disciplined for, or prevented from, performing pre-shift work.  *See, e.g.*, *Chao*, 514 F.3d at 288 ("If [an employer] were serious about preventing unauthorized overtime, it could discipline [employees] who violate the rule.").

Third, plaintiffs have conclusively established that defendant knows that they perform at least some unpaid, pre-shift work.  Whether an employer has actual or constructive knowledge is a question of fact.  *See Holzapfel v. Town of Newburgh*, 145 F.3d 516, 521 (2d Cir. 1998).  "An employer has constructive knowledge of work if it should have known about the work through the exercise of reasonable diligence."  *Perry*, 78 F.4th at 512.

Although "[c]ourts often rely on deposition testimony from employees themselves about what their supervisors knew regarding uncompensated overtime," *Worley v. City of N.Y.*, 2020 WL 730325, at *5 (S.D.N.Y. Feb. 12, 2020), evidence of physical proximity to supervisors, or work-related interactions with supervisors, during contested work periods will also be relevant to an employer's actual or constructive knowledge of that working time.  *See, e.g.*, *Lynch v. City of N.Y.*, 291 F. Supp. 3d 537, 550 (S.D.N.Y. 2018); *Fangrui Huang v. GW of Flushing I, Inc.*, 2021 WL 54085, at *4 (E.D.N.Y. Jan. 6, 2021) (collecting cases about constructive knowledge based on certain kinds of interactions with supervisors or managers).

Defendants have failed to validly place in dispute plaintiffs' strong showing of actual or constructive knowledge. For instance, defendant admits that CO plaintiffs work in 8-hour shifts without a scheduled overlap, SOF ¶¶ 29–32, cannot leave their post until they are relieved by the oncoming officer, *id*. ¶ 66, and must engage in a face-to-face process that takes, on average, 5 to 15 minutes, *id*. ¶¶ 58–60. Dispatch plaintiffs' shifts overlap in practice, too. *Id*. ¶ 137.

Under the timekeeping policies, this time would get rounded to zero even if it were done "on the clock." Defendant tries to "deny" some of this *de facto* shift overlap by asserting that "shift times are approximate." D's Resp. ¶ 133. But even crediting this statement, the record establishes that, through the exercise of reasonable diligence, defendant's management should have known about the shift overlaps: there is a camera and an electronic log in the CO plaintiffs' briefing room, both of which can be reviewed by administrative staff, SOF ¶¶ 131–32, and the Dispatch plaintiffs' supervisor in the Public Safety Building can see in real-time the employees who use their electronic fobs to access certain areas around that building, *id*. ¶ 138.

Defendant's conclusory denials of knowledge also fail to create a genuine dispute of fact about actual knowledge of at least some of this pre-shift work. For instance, it is undisputed that the Lieutenants (who function as supervisors) "work the same shifts" as CO plaintiffs (except for overnight shifts). SOF ¶ 135. And as for the Dispatch plaintiffs and Civil Clerks, the Dispatch plaintiffs' supervisor has witnessed overlapping shift changes and failed to make any inquiry or prevent it from happening. Gordon Dep., Dkt. No. 45-20 at 72–73.

Even viewed in the light most favorable to defendant, the non-movant, the proof lines up in one direction here: given the nature and scope of the pre-shift work, the close conditions under which it is being performed, the limited locations at which it is being performed, and the relative proximity of supervisory staff in those settings, there is simply no basis on which a rational fact-

finder could *not* conclude that, through the exercise of reasonable diligence, defendant knew or should have known about most if not all of plaintiffs' routine, unpaid, pre-shift work. There is certainly no basis on which to contest the issue of *liability* under the FLSA.

Defendant's objections to this conclusion are plainly meritless. For example, defendant claims that:

> Defendant has shown through witness testimony that there was no reason to believe any work activities were being performed prior to the state of an employee[']s scheduled shift because work activities are not being performed prior to the start of their scheduled shift.
>
> . . . . .
>
> As no supervisor or administrator in the County has witnessed employees performing work prior to punching in for their shifts, there was no reason to inquire if such was occurring.

Def.'s Opp'n at 4. But these *ipse dixits* are conclusively rebutted by the undisputed evidence offered by plaintiffs, which has been summarized *supra*.

Likewise, defendant contends that it lacked knowledge of pre-shift work because it: (1) "maintains a reporting procedure for grievances when an employee believes that they have been mistreated or a violation of the FLSA has been committed"; (2) "maintains policies promoting complete documentation of their time cards so that employees will be properly compensated"; and (3) "has held several instructional sessions to promote accurate timekeeping." Def.'s Opp'n at 4.

Even crediting these claims, they do not create a fact question on knowledge under the circumstances. First off, defendant cannot delegate recordkeeping duties to its employees. 29 C.F.R. § 211(c). Second, while the existence of a reporting system may bear on the question of constructive knowledge, an "employee's failure to report work the employer in fact knew about or required does not protect the employer from FLSA liability." *Perry*, 78 F.4th at 513 & n.9.

In sum, plaintiffs have established, as a matter of law, that defendant "suffers or permits" pre-shift work, enforces the 7-minute clock-in rule, and then rounds that pre-shift time down to zero for payroll. Because this timekeeping policy creates "daily off-the-clock, unpaid overtime work" in addition to plaintiffs' 40-hour-a-week schedules, this work must be compensated at an overtime rate under the FLSA. Accordingly, plaintiffs are entitled to summary judgment as to defendants' *liability* on this claim. *See, e.g.*, *Lynch*, 291 F. Supp. 3d at 551 ("[N]o reasonable juror, on the evidence (and lack of evidence) presented, could find that defendant did not have either actual or constructive knowledge of its employees' uncompensated hours.").

### 2. Failure to Properly Calculate Plaintiff's Regular Rate of Pay

The FLSA requires employers to pay compensation "for a workweek longer than forty hours" at an overtime rate, which is defined as "not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). In turn, the "regular rate" is defined as the "hourly rate actually paid to the employee for the normal, non-overtime workweek for which he is employed." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945).

This "regular rate" is "deemed to include all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). Although the statute includes a list of exceptions to this rule, § 207(e)(1)–(8), this list is exhaustive, 29 C.F.R. § 778.207(a), and these exceptions are interpreted narrowly against the employer, *see Mitchell v. Kentucky Fin. Co.*, 359 U.S. 290, 295 (1956), which bears the burden of showing that an exception applies, *see Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 209 (1966).

Plaintiffs contend that they are entitled to summary judgment on the issue of defendant's liability under this provision of the FLSA. *See* Pls.' Mem. at 21–22. According to plaintiffs, the undisputed evidence conclusively establishes that defendant underpaid them because it failed to

include "shift differentials, cash payments in lieu of health insurance, and retroactive pay increases" in the "regular rate of pay" when calculating their overtime payments. *Id*. at 22.

In opposition, defendant argues that the Collective Bargaining Agreement ("CBA") in place between the parties "incorporates such payments and Defendant['s Rule 30(b)(6) witness] testified that whatever was in the contract was how the rate was calculated." Def.'s Opp'n at 5 (citing D's Rep. ¶¶ 139–41).

In reply, plaintiffs acknowledge that the CBA does include certain premiums (including "longevity pay") in the base salary. Pls.' Reply at 9 n.3. However, plaintiffs emphasize that this claim is not about longevity pay. *Id*. Instead, this "regular rate" claim is based on unpaid "shift differentials, cash payments in lieu of health insurance benefits, Rabies Clinic premiums, Field Officer Training Premiums, Officer in Charge premiums, and retroactive pay increases." *Id*. (citing SOF ¶¶ 143–44).

On those issues, plaintiffs assert that it is no defense that the CBA "allegedly instructs the County to pay Plaintiffs' overtime correctly" because "the CBA does not address whether these premiums are included in the regular rate of pay when the County calculates overtime." Pls.' Reply at 9. In plaintiffs' view, "it is irrelevant whether the CBA incorporates the correct law regarding the calculation of overtime pay, as liability is based on whether Defendant *actually paid* Plaintiffs overtime at the correct rate." *Id*. at 10 (emphasis in original).

Plaintiffs clearly have the better of this argument. Without belaboring the analysis with a string of citations, the FLSA is concerned with what actually happened with an employee's pay, not with what an employment contract might have required. Importantly, plaintiffs retained an expert to analyze payroll data. SOF ¶ 142. Plaintiffs' expert found that defendant's payments failed to include the contested premium payments or retroactive pay increases. *Id*. ¶¶ 142–44.

Defendant "admits" this expert's findings, D's Resp. ¶¶ 142–44, but "denies," without any accompanying record citation, that the findings are accurate, *see id.* Obviously, this is not enough to validly place these facts in dispute on summary judgment. In fact, as plaintiffs point out, defendant did not depose this expert, submit a competing export report, or provide any basis on which to conclude that defendant might have properly calculated plaintiffs' "regular rate" of pay. Accordingly, plaintiffs are entitled to partial summary judgment as to defendants' liability on this "regular rate" claim.

### 3. Untimely Payment of Plaintiffs' Pre-Approved Overtime

The FLSA includes a "prompt payment" requirement. *Rogers v. City of Troy*, 148 F.3d 52, 55 (2d Cir. 1998). As relevant here, "[p]ayment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made." 29 C.F.R. § 778.106. Whether this "prompt payment" requirement has been violated is "determined by reference to objective standards," *Rogers*, 148 F.3d at 58, and "focuses not only on how often late payments were made or how late they were, but also on whether the payments were made as soon as practicable." *Lynch*, 291 F. Supp. 3d at 548 (cleaned up). Although there is no bright line rule, several courts in this circuit have held "that two weeks is an unreasonable amount of time for an employer to delay a paycheck." *Accosta v. Lorelei Events Grp., Inc.*, 2022 WL 195514, at *4 (S.D.N.Y. Jan. 21, 2022) (cleaned up).

Measured against this general standard, plaintiffs are entitled to summary judgment on the question of liability as to this claim. As plaintiffs point out, there is unrebutted testimony establishing that plaintiffs have been paid overtime late and have sometimes had some overtime missing from their paychecks. SOF ¶ 147. Defendant, for its part, "denies" these assertions by

stating: "Defendant will cut a check to an employee if overtime will not make it into their paycheck for that week."  D's Resp. ¶ 147.

This conclusory statement about what defendant might do with payroll does not validly place plaintiffs' factual offering in dispute.  In an attempt to avoid this outcome, defendant also argues that certain delays in overtime payments are caused by "instances where employees forget to mark their timecards," requiring administrators to follow up individually.  Def.'s Opp'n at 6; D's Resp. ¶ 146 (claiming notes on timecards "are often missing or illegible").

To be sure, these explanations might impact the quantum of damages.  *See Lynch* 291 F. Supp. 3d at 548 ("Issues that affect the practicability of payment could include both archaic and difficult-to-manage payroll systems; they could also include the failure of plaintiffs to correctly record their own overtime.").

But even crediting the reality that defendant's timekeeping system poses administrative challenges, it would not be a defense to liability because it does not specifically rebut plaintiffs' showing on this point—that the representative plaintiffs have been paid overtime more than two weeks after it was worked.  SOF ¶ 147.

In reaching this conclusion, it bears emphasizing that the FLSA places the responsibility for tracking time on the employer.  29 U.S.C. § 211(c).  Indeed, defendant has admitted that it has a suitable tool available: its payroll software is able to track this information as long as it is accurately inputted by administrative staff.  *See* SOF ¶ 148.  Accordingly, plaintiffs are entitled to partial summary judgment as to defendants' liability on this "prompt payment" claim.

### 4.  Liquidated Damages

Under the FLSA, an employer "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages or their unpaid overtime compensation, as the case

may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Even so, district courts have "discretion to deny liquidated damages where the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008). "The employer bears the burden of proving good faith and reasonableness, but the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) (citation omitted).

"To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Herman*, 172 F.3d at 142 (citing *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)). "The defense requires plain and substantial evidence of at least an honest intention to ascertain what the [FLSA] requires and to comply with it." *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987). "An employer's actions are objectively unreasonable when it knows of the FLSA's requirements but does not take steps to comply with them." *Lynch*, 291 F. Supp. 3d at 548 (citing *Herman*, 172 F.3d at 142–43).

The record establishes that plaintiffs are entitled to liquidated damages. As plaintiffs summarize, defendant has admitted that it failed to take many of the actions that would tend to show good-faith compliance with the FLSA. SOF ¶¶ 149, 153, 156, 158, 168. As plaintiffs also point out, many of defendant's "denials" about actions that would be relevant to this compliance inquiry are once again based on conclusory assertions about what defendant's policies or rules officially require. D's Resp. ¶¶ 150, 152, 154, 159, 160, 162. But as this Court has explained, the mere existence of official policies and rules that describe how things are supposed to work does not validly place the relevant facts in dispute for the purpose of summary judgment.

Finally, as plaintiff correctly argues, defendant has failed to create a genuine fact dispute about whether an "advice of counsel" defense might apply. The advice-of-counsel defense may be relevant to evaluating the party's good faith where the legal advice was sought and rendered before the alleged violation occurred. But in this case, defendant's 30(b)(6) witness testified:

> Q:    So I don't want to know what your attorneys told you with respect to the lawsuit. I – I guess other than what you just described, did the County seek any advice separate and apart from the lawsuit with – with respect to whether its pay policies and practices for employees in the Sheriff's Department are compliant with the FLSA?

> A:    Not – not to my knowledge. No. Not on this issue. Not – not to the issues relative to this case.

Chamberlain Dep., Dkt. No. 45-22 at 54. In short, for the reasons explained in plaintiffs' moving and reply memoranda, there is no basis in this record on which to conclude that defendant could carry its burden of proving good faith and reasonableness. Instead, there is every indication that this is the normal FLSA case where double damages should be awarded. Accordingly, plaintiffs are entitled to partial summary judgment as to defendant's liability for liquidated damages.

## V.    CONCLUSION

Plaintiffs' motion for partial summary judgment on defendant's liability under the FLSA must be granted. Even viewed in the light most favorable to defendant, the non-movant, there is no basis on which a rational fact-finder could conclude that defendant does not "suffer or permit" plaintiffs to engage in some amount of unpaid, pre-shift work. "Ultimately, the dispute as to the precise amount of [ ] uncompensated work is one of fact for trial." *Kuebel*, 643 F.3d at 364.

Likewise, in the face of plaintiffs' unrebutted expert report, there is no genuine dispute of fact about defendant's failure to properly calculate plaintiffs' "regular rate" of pay for overtime payments. The record further establishes that defendant has, on certain occasions, violated the

"prompt payment" requirement.  Finally, it is clear from the record that this is the ordinary case in which liquidated damages should be awarded.

A trial on damages will be time-consuming and costly.  The parties are directed to meet and confer in a good-faith effort to resolve the damages issue in a manner that is consistent with the FLSA's remedial purpose.  To facilitate a just resolution, the Court will refrain from adding this case to its trial calendar for a sixty-day period.

Therefore, it is

ORDERED that

1.  Plaintiffs' motion for summary judgment (Dkt. No. 42) is GRANTED; and

2.  The parties shall file a joint status report in SIXTY DAYS regarding the progress of settlement.

The Clerk of the Court is directed to terminate the pending motion and set a deadline accordingly.

**IT IS SO ORDERED.**


Dated:  February 2, 2026
            Utica, New York.

Anthony J. Brindisi
U.S. District Judge